UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

JIMMY ENGLISH and WILLIAM ZIMMERLEE, :
individually and on behalf of others similarly
situated,                                          :

              Plaintiffs,          :          06 Civ. 5672   (PAC)

                                :

    - against -                                   :          <u>OPINION AND ORDER</u>

                                :

ECOLAB, INC.,
               Defendant.          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

      HONORABLE PAUL A. CROTTY, United States District Judge:

      Plaintiff Jimmy English, individually and on behalf of others similarly situated,

brings the instant action against Defendants Ecolab, Inc., pursuant to the Fair Labor

Standards Act ("FLSA"), 29 U.S.C. §§ 201 <u>et</u> <u>seq.</u>  Plaintiff alleges that, during the

course of his employment, he was denied premium pay for overtime work.  The FLSA

requires that all hours worked in excess of forty hours per week be compensated at one

and one-half times the minimum wage, 29 U.S.C. § 207(a)(1); but this requirement does

not apply to workers in retail stores or other service establishments who (1) are paid a

wage that exceeds one and a half times the minimum wage and (2) receive more than half

their compensation in the form of "commissions on goods or services" (the "§ 7(i)

exemption"). 29 U.S.C. § 207(i).  The issue in this action, which arises on the parties'

cross-motions for summary judgment, is whether commission-compensated local service

technicians in a nationwide network of exterminators work for a "retail or service

establishment" within the meaning of the statute.  For the reasons that follow,

Defendant's motion for summary judgment is GRANTED, and Plaintiffs' motion is

DENIED.

**BACKGROUND**

The facts are largely undisputed. Plaintiffs[1] were among approximately 1,900 employees in the Pest Elimination Division of Defendant Ecolab, the largest provider of premium commercial pest elimination services in the United States. Ecolab does business by developing extended service agreements with commercial entities, most importantly multi-unit businesses such as fast-food franchises or hotel chains. It contracts to provide service at regular intervals (usually monthly) for a specified period of time (usually a year or longer). The sales department then instructs the service specialist assigned to the customer's region to fulfill Ecolab's duties under the contract by providing on-site service.

Both potential and existing customers contact Ecolab via a toll free number that rings at the Ecolab customer service center in North Dakota. These calls are then routed to the local service specialists responsible for the customers' pest elimination needs. Once the assignments are allocated, individual specialists have flexibility to schedule their service calls. They may schedule all of their customer obligations in a single week or space them out over the course of a given month. The service specialists earn a base salary plus commissions based on a sliding scale percentage of revenues generated in

---

[1] At the time Plaintiffs filed their Motion for Conditional Certification, the captioned plaintiffs were the named plaintiff, English, and an opt-in plaintiff, Thomas Tourigny. (See Plaintiffs' Memorandum in Support of Their Motion for Conditional Certification at 2.) The parties filed their cross motions for summary judgment on June 29, 2007, when Tourigny was still a party to the present action. In support of their summary judgment arguments, the parties relied on declarations submitted by English and Tourigny in support of their conditional certification motion. (See Affidavit of David Beehler in Support of Defendant's Motion for Summary Judgment, Exs. 3, 4.) Tourigny was terminated as a party on August 10, 2007. For the purposes of this motion, therefore, the Court will not consider evidence based on the Declaration of Thomas Tourigny. Plaintiffs' First Amended Complaint was filed on August 10, 2007, with opt-in Plaintiff William Zimmerlee substituted in the caption in place of Tourigny.

excess of certain benchmarks[2] and/or through the specialists' participation in certain special programs initiated by Ecolab corporate. These variables result in a relatively wide disparity of earnings among specialists.[3] Service specialists do not receive overtime wages for hours worked in excess of forty hours per week.

Plaintiffs, as local service specialists, traveled from location to location providing pest elimination services to their customers. They did not leave from or return to a local Ecolab service center or any other office or workspace owned or leased by Ecolab. Instead, Ecolab requires its employees to maintain a personal workspace to attend to administrative matters, such as reporting activities to the corporate office or planning itineraries of upcoming service visits. The individual Plaintiffs, like many service specialists, reserved space in their homes (the "home office").

## PROCEDURAL HISTORY

Plaintiff Jimmy English seeks the Court's approval to circulate notice of this lawsuit to similarly situated pest elimination service specialists employed by Ecolab. His proposed notice alerts potential members of their ability to opt in to the present suit, which would proceed as a collective action pursuant to 29 U.S.C. § 216(b). While the Court has not yet ruled on English's motion for notice, eleven service specialists have filed opt-in notices.[4]

Three motions are currently pending: (1) Defendant's motion for summary judgment regarding the § 7(i) exemption; (2) Plaintiffs' partial motion for summary

---

[2] For "regular extermination" services, Specialists are paid 5% of the net invoiced amount (up to $5,000) per month; 15% for net invoiced amounts between $5,000 and $7,500 per month; and 18% on net invoiced amounts over $7,500 per month. (Defendant's Statement of Facts ("DSOF") ¶ 20.)

[3] In 2005, the annual compensation for specialists ranged from $30,657 to $75,006, with the average compensation for normal service specialists at $40,848 and for senior service specialists at $48,475. (DSOF ¶ 24.)

[4] These plaintiffs, in order of filing, are Richard Lamont, Bruce E. Willard, Simon Flores, William H. Zimmerlee, Brian Lee Jackson, John Edward Van Horn, Barry Farlett, Melinda Neumann, Michael P. Thompson, Warren Olsen, Robert Szemelak, and Timothy C. Kellogg.

judgment regarding the § 7(i) exemption and the Motor Carrier Act exemption[5]; and (3) Plaintiffs' motion for conditional certification of a collective action and circulation of notice. The Court turns first to the § 7(i) exemption because its resolution obviates discussion of the remaining motions.

## DISCUSSION

## I. The § 7(i) Exemption

The § 7(i) exemption has three requirements; the employee: (1) must earn at least one and one-half times the federal minimum wage; (2) must earn more than half of his salary in commissions for a representative period not less than one month; and (3) must work for a retail or service establishment. See 29 U.S.C. § 207(i); 29 C.F.R. §§ 779.410 et seq.; Schwind v. EW & Assocs., Inc., 371 F. Supp. 2d 560, 563 (S.D.N.Y. 2005). There is no dispute that the first two requirements are satisfied. (See Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Pls.' Opp'n") at 10 & n.7.) The Court turns to the remaining question: is the work at issue performed for or at a "retail or service establishment" as required for exemption?

## A. The Relation of § 7(i) to the § 13(a)(2) Exemption in the Context of a "Retail or Service Establishment"

The statutory provision that contains the § 7(i) exemption does not define the term "retail or service establishment." See 29 U.S.C. § 207(i). Instead, the Court must apply the definition contained in a now-repealed FLSA provision, § 13(a)(2), the former "retail or service establishment" exemption (the "§ 13(a)(2) exemption"). 29 U.S.C. § 213(a)(2) (repealed by Pub. L. No. 101-157 (1989)); see 29 C.F.R. § 779.411 (explaining that, for purposes of the § 7(i) exemption, a "retail or service establishment" is as defined in §

---

[5] 29 U.S.C. § 213(b)(1). The overtime provisions of the FLSA do not apply to any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service rules pursuant to certain provisions of the Motor Carrier Act.

4

13(a)(2) of the FLSA); Schwind, 371 F. Supp. 2d at 564 n.4; Reich v. Delcorp, Inc., 3 F.3d 1181, 1183 (8th Cir. 1993). Section 13(a)(2) specifically defined a "retail or service establishment" as "an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry." 29 U.S.C. § 213(a)(2) (repealed).[6] Although courts interpreting the current § 7(i) exemption rely on language in the former § 13(a)(2) exemption, the two provisions were designed to address fundamentally different wage and hour concerns.

The § 13(a)(2) exemption was a part of the original FLSA, enacted in 1938, see Fair Labor Standards Act of 1938, ch. 676, § 1, 52 Stat. 1060 (1938) (current version at 29 U.S.C. §§ 201 et seq.), and was intended to exclude "'business . . . of a purely local nature.'" A.H. Phillips, Inc. v. Walling, 324 U.S. 490, 497 (1945) (citing S. Rep. No. 75-884, at 5 (1938)). It exempted "those regularly engaged in local retailing activities and those employed by small local retail establishments, epitomized by the corner grocery, the drug store and the department store." Id. Congress "felt that retail concerns of this nature do not sufficiently influence the stream of interstate commerce to warrant imposing the wage and hour requirements on them." Id. Based on this concern, Congress made an employer's entitlement to the § 13(a)(2) exemption contingent on the size of the establishment and the types of transactions in which it engaged.

---

[6] Simply meeting this definition did not qualify an establishment for the so-called "retail or service establishment exemption." At the time it was repealed, § 13(a)(2), which had been amended several times, required that a business seeking the exemption also had to make more than 50 percent of its annual dollar volume of sales within the state in which the business was located and generate annual gross revenues below certain dollar thresholds. 29 U.S.C. § 213(a)(2) (repealed). As these additional requirements constituted elements of the exemption, rather than the definition of a retail or service establishment, Ecolab correctly argues that it need not meet these criteria to establish the applicability of the § 7(i) exemption. (See Reply Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Def.'s Reply") at 6-7.)

The § 7(i) exemption was added in 1961. See Pub. L. No. 87-30 § 6(g), 75 Stat.

65 (1961).[7]  That year, Congress made a significant change to the FLSA.  Prior to 1961,

FLSA coverage was, at its base, contingent on the nature of the employment of an

individual employee, not necessarily the overall nature of the business for which she

worked. See 29 U.S.C. §§ 206(a), 207(a)(1).  In certain situations, one employee might

be covered while another employee working for the same employer might not. See 29

C.F.R. § 776.2(a).  In 1961, Congress changed this by enacting "enterprise coverage,"

whereby any employee working for an "enterprise" meeting certain requirements was

covered by the FLSA, even if that individual would not have been otherwise covered. See

29 U.S.C. §§ 203(r), (s)(1), 206(b); see also Maryland v. Wirtz, 392 U.S. 183, 186 (1968)

(explaining the change in coverage effected by the 1961 amendment).  An enterprise was

defined as "the related activities performed (either through unified operation or common

control) by any person or persons for a common business purpose, and includes all such

activities whether performed in one or more establishments."[8] 29 U.S.C. § 203(s)(1).

Under the newly-enacted "enterprise coverage" in 1961, enterprises with a gross

volume of sales over one million dollars (since reduced to $500,000) were subject to the

FLSA wage and hour requirements. See Pub. L. No. 87-30, § 2(b); Zorich v. Long Beach

Fire Dept. & Ambulance Serv., Inc., 118 F.3d 682, 685 (9th Cir. 1997).  This expanded

coverage, however, negatively affected smaller "retail or service establishments" that

were part of a larger "enterprise."  For example, a company with six retail locations, each

with revenues of $200,000, would be subject to coverage under the FLSA because the

aggregate volume of sales was over one million dollars, even though each retail

[7] The § 7(i) exemption was originally enacted as § 7(h) of the FLSA. See Pub. L. No. 87-30, § 6(g).  It was
renumbered as § 7(i) in 1966. See Pub. L. No. 89-601, § 204, 80 Stat. 830 (1966)
[8] It is important to distinguish between an "enterprise" and an "establishment."  An enterprise can consist
of many "establishments." See 29 C.F.R. § 779.303.

establishment standing alone would not be covered. To counteract this, § 13(a)(2) was modified to exempt "establishments" that were part of a covered "enterprise," but only those with sales of less $250,000. See Pub. L. No. 87-30, § 9(a)(2)(iv). This stipulation "insure[d] that the original intent of the sponsors of the act to exclude the small local retail merchants such as the corner grocer, neighborhood drugstore, barbershop or beauty parlor [was] carried out." S. Rep. No. 87-145, at 27 (1961).

The expansion of FLSA coverage to all employees of large enterprises posed a problem to newly-qualifying employers of commissioned employees. See Hearings before the Special Subcommittee on Labor of the Committee on Education and Labor on H.R. 3935, 87th Cong. 16 (1961) (statement of Arthur Goldberg, Secretary of Labor) (noting the failure of the original bill drafters to consider the problem faced by employers who have commission-compensated employees). Specifically, commissioned employees are subject to the whims and vagaries of the consuming public, especially for big ticket items.[9] One Circuit Court recently explained:

> The essence of a commission is that it bases compensation on sales, for
> example a percentage of the sales price, as when a real estate broker
> receives as his compensation a percentage of the price at which the
> property he brokers is sold. Although his income is likely to be influenced
> by the number of hours a week that he works, the relation is unlikely to be
> a regular one. In one week business may be slow; he may make no sales
> and thus have no income for that week. The next week business may pick
> up and by working overtime that week he may be able to make up the
> income he lost because of slack business the previous week. Over a year
> his hours of work may be similar to those of regular hourly employees. So
> if he had to be paid overtime, his annual income would be higher than

---

[9] Establishments engaging in the retail of "big ticket" items include "those dealing in furniture, bedding and home furnishings, floor covering, draperies, major appliances, musical instruments, radios and television, men's clothing, women's ready to wear, shoes, corsets, home insulation, and various home custom orders." 29 U.S.C. § 779.414. While these "big ticket" shops are the most obvious examples of establishments whose employees are paid by commission (or at least were in 1970), the regulations contemplate the existence of other, non-"big ticket" segments in retailing where the exemption may be applicable. See id. The exemption has been applied, for instance, to employees in the banquet departments of hotels and restaurants, "since commission-type methods of payment are traditionally used there as well." Mechmet v. Four Seasons Hotels, Ltd., 825 F.2d 1173, 1176 (7th Cir. 1987).

> theirs even though he hadn't worked more hours over the course of the
> year than they had. We take this to be the rationale for the commission
> exemption from the FLSA's overtime provision.

Yi v. Sterling Collision Ctrs., Inc., 480 F.3d 505, 508 (7th Cir. 2007); see also Mechmet v. Four Seasons Hotels, Ltd., 825 F.2d 1173, 1177-78 (7th Cir. 1987) (explaining that well-compensated commissioned employees are "not the marginal, non-unionized workers for whom the overtime provisions were designed"). The § 7(i) exemption addresses these problems by excluding from coverage those employees of larger establishments whose compensation consisted of at least fifty percent commissions and who were paid at least one and one-half times the minimum wage. See Pub. L. No. 87-30, § 6(g); H.R. Rep. No. 87-75, at 11 (1961) ("The bill adds a new section 7(h) [now 7(i)] to the act which would relieve retail or service establishments from paying overtime compensation to commission employees under certain conditions."). Note, however, that although the exemption was crafted to meet the concerns of large businesses, its application does not turn on the size of the employer. Instead, it focuses on the method of payment for those engaged in retail sales.

Although courts addressing the § 7(i) exemption rely on the § 13(a)(2) definition, the exemptions were intended to focus on different types of employees and establishments. Specifically, the § 7(i) exemption depends primarily on how an employee is paid—employees must receive 50% of their compensation in commissions and earn at least 1.5 times the minimum wage. See Gieg v. DDR, Inc., 407 F.3d 1038, 1046 (9th Cir. 2005) ("The policy justification for the exemption thus appears to have more to do with the employee's compensation than with the exact nature of the goods or services sold."). The manner in which employees were paid was simply irrelevant to § 13(a)(2). Additionally, while the § 13(a)(2) exemption applied only to smaller

establishments (with gross revenues under $250,000), the § 7(i) exemption contains no such limitation, and was intended to apply both to large establishments and large enterprises comprised of numerous establishments. See, e.g., Yi v. Sterling Collision Ctrs., Inc., No. 04 C 3138, 2006 WL 1444897, at *1 (N.D. Ill. May 17, 2006), aff'd, 480 F.3d 505 (applying the § 7(i) exemption to a chain of auto body repair shops that employed over 800 individuals "nationwide," and was a wholly-owned subsidiary of Allstate). These distinctions between the two exemptions do not mean that all discussion of the term "retail or service establishment" developed under § 13(a)(2) has no relevance to § 7(i). Rather, it means that the cases and regulations interpreting § 13(a)(2) apply with less force, or perhaps in some cases not at all, to employers claiming the § 7(i) exemption.

**B.  The Regulatory Framework**

While the § 13(a)(2) definition of a "retail or service establishment," "narrows the class of establishments that may qualify as retail," Martin v. The Refrigeration Sch. Inc., 968 F.2d 3, 5 n.1 (9th Cir. 1992), the application of that definition to specific types of businesses presents problems of interpretation that the statute does not address. The statute does not define "resale" or "retail," nor is there "guidance in determining the nature of the 'retail' concept." Id. Such questions implicate the specialized knowledge of the agency that administers the statute, the Department of Labor ("DOL"), which has promulgated an extensive series of regulations to address more specific statutory applications. See 29 C.F.R. §§ 779.300 et seq. (addressing the § 13(a)(2) "retail or service establishment" definition and exemption)[10]; see also Schwind, 371 F. Supp. 2d at 564-66

---

[10] The DOL addresses the § 7(i) exemption at 29 C.F.R. §§ 779.410 et seq., but directs the reader to the definition of "retail or service establishment" as set forth in § 779.24 and the application of this term in Subpart D. 29 C.F.R. § 779.411.

(applying the "779" series of regulations to determine whether plaintiffs worked for "retail or service establishment" for purposes of § 7(i) exemption); Barnett v. Washington Mut. Bank, FA, No. C 03-00753 CRB, 2004 WL 1753400, at **3-5 (N.D. Cal. Aug. 5, 2004) (same); Viciedo v. New Horizons Computer Learning Ctr. of Columbus, Ltd., 246 F. Supp. 2d 886, 892-894 (S.D. Ohio 2003) (same); Collins v. Horizon Training Ctrs., L.P., No. 02 Civ. 1310, 2003 WL 22388448, at *5 (N.D. Tex. Sept. 30, 2003) (same); Casas v. Conseco Fin. Corp., No. 00 Civ. 1512 (JRT/SRN), 2002 WL 507059, at **4-5 (D. Minn. Mar. 31, 2002) (same). The Court must now assess what level of deference to afford these regulations.

Rules and interpretations developed by DOL are published in the Code of Federal Regulations. Ordinarily, rules are subject to notice-and-comment rulemaking pursuant to the Administrative Procedure Act (APA), 5 U.S.C. § 553, but "interpretive rules" are exempted from this requirement, 5 U.S.C. § 553(b)(3)(A). This distinction often has practical consequences for district courts; the deference shown to legislative rules may be greater than that shown to interpretations. Compare Chevron U.S.A. Inc. v. Nat'l Res. Def. Council, Inc., 467 U.S. 837, 842-45 (1984) (explaining that regulations are "given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute"), with Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944) (observing that "the rulings, interpretations and opinions of the [agency], while not controlling upon the courts by reason of their authority, do constitute a body of experience for informed judgment to which courts and litigants may properly resort for guidance). "[A]lthough they are entitled to some deference, the weight accorded a particular interpretation under the FLSA depends upon 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors

which give it power to persuade.'" <u>Freeman v. Nat'l Broad. Co.</u>, 80 F.3d 78, 84 (2d Cir.

1996) (quoting <u>Skidmore</u>, 323 U.S. at 140).  Weight and deference need not be given to

interpretations that are inconsistent, not contemporaneous to enactment of the statute, or

stale. <u>Reich v. Gateway Press</u>, 13 F.3d 685, 692 (3d Cir. 1994).

The Supreme Court recently clarified the distinction between regulations and

interpretations, and the corresponding deference to which they are entitled, in <u>Long

Island Care at Home, Ltd. v. Coke</u>. 127 S. Ct. 2339 (2007).  That case implicated the

degree of deference due DOL interpretations in the context of the § 13(a)(15) exemption,

which excludes home health care providers from FLSA coverage.  The plaintiff

challenged, <u>inter</u> <u>alia</u>, a regulation set forth in a subpart of proposed regulations entitled

"Interpretations." <u>Id.</u> at 2349.  She claimed that, as an interpretation, it was not

promulgated pursuant to a delegation of rulemaking authority; instead, it simply

described the agency's view of what the provision meant. <u>Id.</u>  The Court disagreed, based

on three considerations.  First, it noted that DOL formulated and repeatedly amended the

regulation using APA public notice-and-comment procedures, which the agency need not

use when producing an "interpretive" rule. <u>Id.</u> at 2350 (citing 5 U.S.C. § 553(b)(3)(A)).

Second, it refused to rely on the classification of the regulation under the heading

"Interpretation," explaining that it could have referred to the fact that the subpart

contained matters of detail, interpreting and applying the more general definitions in an

earlier subpart. <u>Id.</u>  Finally, the Court determined that Congress would consider the

regulation a legitimate exercise of the authority it delegated to the agency and deem it

binding on the courts. <u>Id.</u> at 2350-51 ("Where an agency rule sets forth important

individual rights and duties, where the agency focuses fully and directly upon the issue,

where the agency uses full notice-and-comment procedures to promulgate a rule, where

the resulting rule falls within the statutory grant of authority, and where the rule itself is reasonable, then a court ordinarily assumes that Congress intended it to defer to the agency's determination.").  Using <u>Chevron</u>-style deference, the Court upheld the regulation.

Several important differences distinguish the regulations relevant to the "retail or service establishment" concept from those at issue in <u>Coke</u>. 29 C.F.R. §§ 779.300 <u>et seq.</u>; 29 C.F.R. §§ 779.410 <u>et seq.</u>  First, unlike other overtime exemption provisions—including the exemption at stake in <u>Coke</u>[11]—the text of 29 U.S.C. § 213(a)(2) did not expressly delegate rulemaking authority to DOL.[12]  While, under certain circumstances, Congress may authorize binding agency rulemaking by implied, rather than express, delegation, <u>see</u> <u>United States v. Mead Corp.</u>, 553 U.S. 218, 229 (2001), the absence of direct language in § 13(a)(2) suggests that Congress did not intend these regulations to have the force of law.  Moreover, Congress's inclusion of an express delegation of interpretive authority in one exemption and complete silence in another implies a distinction.  <u>Bates v. United States</u>, 522 U.S. 23, 29-30 (1997) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

Second, unlike the regulations at issue in <u>Coke</u>, regulations explicating the "retail or service establishment" were not subject to notice-and-comment rulemaking.  The portion of the Federal Register announcing the revision of the relevant regulations states:

> "The administrative procedure provisions of 5 U.S.C. 553 which require notice of proposed rule making, opportunity for public participation, and

---

[11] <u>See</u> 29 U.S.C. § 213(a)(15) ("as such terms are defined and delimited by regulations of the Secretary").

[12] For instance, the "executive exemption," 29 U.S.C. § 213(a)(1), explains that the terms of that exemption are to be "defined and delimited by regulations of the Secretary."

> delay in effective date are not applicable because these are interpretative
> rules.  I do not believe such procedures will serve a useful purpose here."

The Fair Labor Standards Act as Applied to Retailers of Goods and Services, 35 Fed.

Reg. 5856, 5856 (Apr. 9, 1970) (revising 29 C.F.R. pt. 779).  Courts assume "generally

that Congress contemplates administrative action with the effect of law when it provides

for a relatively formal administrative procedure tending to foster the fairness and

deliberation that should underlie a pronouncement of such force."[13] Mead, 533 U.S. at

230 (citation omitted).  While the absence of comment is not dispositive, id., it is a strong

indicator that Congress did not intend Chevron deference to apply to these regulations.

Finally, and most importantly, the regulations themselves state in a threshold

provision entitled "Reliance on interpretations" that Skidmore deference shall apply:

> [T]he Supreme Court has recognized that such interpretations of this Act
> "provide a practical guide to employers and employees as to how the
> office representing the public interest in its enforcement will seek to apply
> it" and "constitute a body of experience and informed judgment to which
> courts and litigants may properly resort for guidance."  Further, as stated
> by the Court:  "Good administration of the Act and good judicial
> administration alike require that the standards of public enforcement and
> those for determining private rights shall be at variance only where
> justified by very good reasons."

29 C.F.R. § 779.9 (quoting Skidmore, 323 U.S. at 139-40).  In addition, at several

junctures, DOL leaves it to the courts to make final determinations as to the applicability

of the various exemptions.  See 29 C.F.R. § 779.7 ("These interpretations indicate the

construction of law which the Secretary of Labor and the Administrator believe to be

---

[13] The § 13(a)(15) exemption at issue in Coke, by contrast, was modified in 1975 only after "comments were received from individuals, law firms, social service groups (both public and private), employers of working mothers, the Women's Bureau of the U.S. Department of Labor, the AFL-CEO, public welfare departments of State and local governments, and business firms providing domestic service workers." Extension to Domestic Service Employees, 40 Fed. Reg. 7404, 7404 (1975).  In fact, the group most impacted by the amendment, "working mothers who employ full-time babysitters," submitted "[m]ost of the comments." Id.  Employers of commissioned employees, the members of the public with the most fundamental interest in the § 7(i) exemption, had no similar opportunity to comment on the regulations bearing on "retail or service establishments."

correct and which will guide them in the performance of their duties under the Act unless and until they are otherwise directed by authoritative decisions of the courts . . . that it is incorrect."); 29 C.F.R. § 779.8 ("The ultimate decisions on interpretations of the Act are made by the courts.").  Thus, in the absence of a controlling statutory directive regarding the rulemaking or interpretive authority of the Secretary, such as that at issue in Coke, see 29 U.S.C. § 213(a)(15), the Court will presume that these preliminary provisions control and only the limited Skidmore deference applies.

Based on the foregoing considerations, the Court concludes that regulations bearing on the term "retail or service establishment" are not entitled to Chevron deference and do not carry the force of law.  The interpretations do not bind, but they may persuade, if on analysis they are in fact persuasive.

Several observations are generally applicable concerning the persuasive power of Part 779.  First, the regulations interpret a statute which has been repealed.  Further, the regulations at issue have not been updated since 1970, almost four decades ago.  While the regulations are frozen in time, the world has changed.  The regulations do not take into account the very substantial changes to the character of the national retail economy, including the domination of sizeable regional or nationwide chains in service industries and the transformative role of various forms of technology.  Regulations which have not been updated in thirty-eight years cannot capture the concept of Wal-Mart as a retailer, for example, or nor large retail chains of franchise fast-food restaurants.  See Gateway Press, 13 F.3d at 692 (giving little weight to twenty-four-year old interpretation). Second, as discussed extensively in Part I.A, the § 7(i) and § 13(a)(2) exemptions, despite their shared definition of "retail or service establishment," address fundamentally

different concerns. Therefore, regulations promulgated with § 13(a)(2) in mind do not necessarily apply with the same force to the employers claiming the § 7(i) exemption.

## II. The Retail or Service Establishment Determination

The DOL regulations articulate the characteristics of a retail or service establishment as follows:

> Typically a retail or service establishment is one which sells goods or services to the general public. It serves the everyday needs of the community in which it is located. The retail or service establishment performs a function in the business organization of the Nation which is at the very end of the stream of distribution, disposing in small quantities of the products and skills of such organization and does not take part in the manufacturing process.

29 C.F.R. § 779.318(a). However, "[t]he legislative history of the section 13(a)(2) exemption for certain retail or service establishments shows that Congress also intended that the retail exemption extend in some measure beyond consumer goods and services to embrace certain products almost never purchased for family or noncommercial use." 29 C.F.R. § 779.318(b). Courts must consider all circumstances relevant to the business at issue as there is "no bright line rule" for the determination. Schwind, 371 F. Supp. 2d at 565; 29 C.F.R. § 779.318(b).[14]

Now, the Court turns to assess whether Ecolab service specialists worked at a "retail or service establishment" within the meaning of the statute.

## A. The Establishment as a Fixed, Physical Place

Plaintiffs' make a threshold argument that they did not work for a "retail or service establishment" because they did not, in fact, work for an establishment. (See

---

[14] The DOL also provides a partial list of establishments whose goods or services may be recognized as retail, including auto dealerships, restaurants, hotels, book stores, clothing stores, grocery stores, and furniture stores, 29 U.S.C. § 779.320, as well as a partial list of establishments lacking a "retail concept," including accounting firms, credit companies, finance companies, insurance brokers, loan offices, and tax services, id. at § 779.317. But this antiquated interpretation does not reflect storefront tax services, such as H&R Block, which is obviously retail. Pest elimination service providers do not appear on either list.

Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment ("Pls. Mem.") at 14-18; Plaintiffs' Reply Memorandum of Law in Further Support of Their Motion for Partial Summary Judgment ("Pls.' Reply") at 4-8; Pls.' Opp'n at 11-16.) The Court finds, however, that Plaintiffs' home offices qualify as "establishments."

For the purposes of both the § 7(i) and § 13(a)(2) exemptions, Congress chose to use the individual establishment, rather than the entire enterprise, as the business unit for evaluating the applicability of the exemption. An "establishment" is a distinct, physical place of business, see 29 C.F.R.§§ 779.23, 779.303, while an "enterprise" is the largest unit of corporate organization and "includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units." 29 U.S.C. §§ 203(r)(1) & (s); see also Bowrin v. Catholic Guardian Soc'y, 417 F. Supp. 2d 449, 457-58 (S.D.N.Y. 2006) (explaining the development of the "enterprise" concept under the FLSA). Thus, the relevant inquiry is not whether Ecolab's nationwide network of service specialists is an appropriate establishment. Rather, the Court must determine whether Plaintiffs were employed by a qualifying establishment at the local or regional level.

As noted above, DOL interprets the term "establishment" as a fixed, physical location. 29 C.F.R. § 779.23. Thus, service specialists, who travel from location to location servicing customer facilities, cannot themselves qualify as "establishments" as contemplated by the statute. See Brennan v. Greene's Propane Gas Serv., Inc., 479 F.2d 1027, 1032 (5th Cir. 1975) ("[S]alesmen do not themselves qualify, either individually or collectively, as an 'establishment' within the meaning of the exemption."); Wirtz v. Keystone Readers Serv., Inc., 418 F.2d 249, 255 (5th Cir. 1969) ("While salesmen may inhabit establishments, in normal parlance they certainly do not constitute them."). The

regulations go on to explain that "an establishment, wherever located, will not be considered a retail or service establishment within the meaning of the Act, if it is not ordinarily available to the general consuming public." 29 C.F.R. § 779.319. Thus, the distinguishing characteristic of an "establishment," aside from a dedicated, physical space, is public accessibility. See Morales v. Sr. Officers' Open Mess, No. 344-72, 1974 WL 1337, at *2 (D.P.R. Nov. 11, 1974) (finding that a private club is not open to the public, and therefore not a retail establishment under the Act).

"Public accessibility," however, does not require in personam access. DOL explains that "[a]n establishment . . . does not have to be actually frequented by the general public in the sense that the public must actually visit it and make purchases of goods or services on the premises in order to be considered as available and open to the general public." 29 C.F.R. § 779.319. For instance, a "refrigerator repair service shop . . . is available and open to the general public even if it receives all its orders on the telephone and performs all of its repair services on the premises of its customers." Id. Thus, telephone contact is sufficient to satisfy the public accessibility requirement. See Wirtz, 418 F.2d at 257 ("We must have either a physical or electronic confrontation or communication between buyer and seller before we can say there is access by the customer to the selling establishment."). Since telephones are more than sufficient, the Court need not dwell on the multitude of technological changes over the last thirty-eight years that provide everyday access between the public and a service establishment.

An Ecolab service specialist has a fixed, permanent establishment; it is their home office (or other personal workspace). While customers do not visit service specialists in their homes (any more than they visit the refrigerator repair man), these employees are readily available for direct, two-way communication with the public through a wide

range of communication devices. <u>See, Stevens v. Welcome Wagon Int'l, Inc.</u>, 261 F. Supp. 227, 231 (E.D. Pa. 1966) (holding that home office of local saleswoman affiliated with nationwide advertising/promotional firm was qualifying establishment for § 7(i) exemption; plaintiff maintained a telephone listing (presumably her home number) in the name of the defendant employer).

Ecolab customers have access to the service specialists, albeit not in a fashion contemplated by the drafters of the DOL regulations, circa 1970. Obviously, the regulations show their age. Customers place service requests or sales calls to the centralized Ecolab customer service center, where, if necessary, the calls are routed to the appropriate local service specialists. The specialists are then reachable either in their home offices or when they are out on calls via cell phones or beepers. The connection between a fixed establishment and customer accessibility is far easier to achieve given today's cellular technologies and other forms of communication. Indeed, the solo refrigerator repairman based out of his home—clearly an establishment under the regulations, 29 C.F.R. § 779.319—would not stay in business long if he lacked cell phone service and was inaccessible while making service rounds. It is not significant that customer calls are routed through the Ecolab customer service center rather than to the specialists directly. In fact, the Ecolab communications model provides greater public accessibility. For instance, in cases of customer emergency or other exigent circumstances, the Ecolab customer service center can pass the call to another local representative if the primary service specialist provider on a given account is unavailable. Customers are not limited to a single specialist or local shop; they have access to an entire network of specialists, each with his or her home base.

The essential characteristics of an "establishment" have been met: the service specialists maintain a fixed, physical work space in their homes and are readily and easily accessible by the Ecolab customer base. Accordingly, Ecolab has established that each individual specialist is an employee of an establishment.

## B. Resale

Next, Plaintiffs contend that Ecolab's sale of pest elimination services to commercial and business entities are sales "for resale." (Pls.' Mem. S.J. at 23-24; Pls.' Reply at 7-9; Pls.' Opp'n at 21-24.) If their argument is correct, Ecolab cannot establish the requirement that more than 75% of its sales are not for resale. Plaintiffs rely heavily on DOL's interpretation of sales "for resale," but the reliance is misplaced.

In determining whether goods or services are sold for resale,[15] "sale" means "any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 C.F.R. § 779.331. "A sale is made for resale where the seller knows or has reasonable cause to believe that the goods or services will be resold, whether in their original form, or in an altered form, or as a part, component or ingredient of another article." Id.; see Schwind, 371 F. Supp. 2d at 564 n.3.

The regulations indicate that the retail character of goods sold to industrial or commercial customers depends on the customers' use of such goods. For instance, coal sold for the production of electricity is a raw material used in the production of a specific product to be sold and is therefore considered "for resale." 29 C.F.R. § 779.333. By contrast, coal sold to businesses such as bakeries for purposes of fuel and/or heat is not "for resale." Id. In another example, ice used to keep perishable items cold is not for resale, while ice cubes sold for use in drinks are for resale. Id. The distinction turns on

---

[15] Resale means "selling again." 29 C.F.R. § 779.331.

whether the good is sold to the end consumer in either in its original or altered form or consumed by the commercial or business entity for general uses.

According to DOL, the same distinctions apply for sales of services. Four prototypical examples of services sold for resale are provided: (1) the sale of watch repair services to jewelers who resell the services to their own customers; (2) the sale of auto repairs by a garage to a used car dealer; (3) the sale of services performed by a dental laboratory in the making of artificial teeth for the dentist for the use of his patients; and (4) the sale of services of a fur repair and storage establishment performed for other establishments who sell these services to their own customers. 29 C.F.R. § 779.334. These have in common the work of a specialty technician on a product or retail good that requires a greater level of care and/or service than a standard retailer can provide. Pest elimination services are not consistent with these examples. Ecolab service specialists do not fumigate goods that are then sold to the end consumer by a retailer. Ecolab makes this very distinction, albeit facetiously, when it states that a restaurant does not wrap up and sell to customers a glue strip placed by a service specialist. (See Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Def.'s Mem. S.J. at 8-9.) This does not end the analysis, however. DOL goes on to state that:

> in certain circumstances, sales of services to a business for a specific use in performing a different service which such business renders to its own customers are in economic effect sales for resale as a part of the service that the purchaser in turn sells to his customers, even though such services are consumed in the process of performance of the latter service. For example, if a storage establishment uses mothproofing services in order to render satisfactory storage services for its customers, the sale of such mothproofing services to that storage establishment will be considered a sale for resale.

29 C.F.R. § 779.334. DOL does not explain what "certain circumstances" render a sale of non-related services "for resale" aside from providing the mothproofing services

example.  As Plaintiffs argue, the mothproofing example is very similar to the case at bar.

Restaurants rely on Ecolab pest elimination services in order to (1) comply with

municipal health regulations and (2) offer food to its customers in a clean, pest-free

environment.[16]  They then "resell" these pest elimination services to their customers as

part of the price of the food they serve, even though these services have been "consumed"

by the restaurant in the course of food storage, preparation, and service.

Plaintiffs' argument that the sale of pest elimination services is one of the "certain

circumstances" where the sale of a service to a business providing a distinctly different

service is a sale for resale is little more than an ipse dixit.  It is hardly persuasive.  The

sale of any such service, or, in fact, any good whatsoever, to a commercial entity

constitutes a sale for resale if the distinction turns on whether the commercial customer

passes the cost of such goods and services on to the end consumer.  This would do

substantial harm to the examples listed in 29 C.F.R. § 779.333.  For instance, when an

end consumer purchases a piece of fruit displayed on a bed of ice, he pays not only for

the fruit but for the ice that kept it fresh, even though he is not physically transporting

that ice from the grocery.  This is no different from the restaurant patron, who pays for

the cost of pest elimination services as part of the overall cost of his dinner bill. See 29

C.F.R. § 779.334.  Crucially, however, the patron is also paying for cost of utilities,

cooking equipment, hand soap in the restroom, and, yes, the ice used to keep the salad bar

---

[16] In part, Ecolab markets its pest elimination services as a means to both protect the health and safety of its clients' customers and improve or maintain a positive commercial reputation. (Plaintiffs' Statement of Facts ("PSOF") ¶¶ 63, 64.)  It also claims that its services are a way for its clients to pass health inspections and stop the spread of infectious disease. (PSOF ¶ 65.)  Under some contracts, Ecolab must reimburse its customers if they incur certain costs because of its failure to effectively eliminate pests. (PSOF ¶ 66.)  For instance, Ecolab's contract with Speedway SuperAmerica LLC contains a warranty provision that, "[i]f SSA is fined by a government agency due solely to the failure of Ecolab to remove an infestation of rats, mice, or cockroaches, Ecolab will reimburse SSA for the amount of the fine." (Summary Judgment Declaration of Michael J.D. Sweeney, Esq. ("Sweeney S.J. Decl."), Ex. 14 at D001191.)  Indeed, the majority of Ecolab's client base comes from industries (including restaurants, hotels, and supermarkets) whose success is contingent, in part, on cleanliness and the absence of pests. (PSOF ¶¶ 67, 68.)

fresh. Indeed, the end consumer pays for every good or service used by the restaurant. The Court discerns no basis for classifying sales of pest elimination services, but not certain types of ice, as sales "for resale."

In the absence of a more precisely articulated test for determining whether sales of distinct services are "for resale," the Court reaches the common sense conclusion that Ecolab pest elimination services are not for resale.

## C. Recognized as Retail

The definition of "retail or service establishment" in § 213(a)(2) requires that 75% of the business's goods or services be "recognized as retail sales or services in [its] particular industry." See Mitchell v. Ky. Fin. Co., 359 U.S. 290, 291 (1959). In Idaho Sheet Metal Works, Inc. v. Wirtz, the Supreme Court held that the meaning of "retail" is to be determined by the courts, not by the defendant or the defendant's industry.[17] 383 U.S. 190, 204-05 (1966). Plaintiffs argue that Ecolab is a wholesaler because it markets its services to and generates revenues almost exclusively from commercial entities. (See Pls.' Mem. S.J. at 19-20.) But sales to commercial entities do not equate to wholesale sales. Plaintiffs here are trying to take advantage of the lack of clarity in the outdated regulations.

As an initial matter, Plaintiffs acknowledge that the pest elimination industry, in general, has a retail concept. (See Pls.' Opp'n at 16.) Nevertheless, they then claim that Ecolab's business model is predicated on wholesale, because its sales are

---

[17] Though the Court must assess whether Ecolab's sales are recognized as retail "in" the pest elimination industry, "[i]t is clear from the legislative history and judicial pronouncements that it was not the intent of this provision to delegate to employers in any particular industry the power to exempt themselves from the requirements of the Act." 29 U.S.C. § 779.324. "[T]here is no touchstone or uncomplicated test to apply in resolving the inquiry as to whether a transaction is retail, but rather a case by case approach is in order with the referents being common sense and common parlance." Shultz v. Crotty Bros. Tex., Inc., 310 F. Supp. 761, 767 (E.D. Tex. 1970).

overwhelmingly to a commercial customer base. They argue that the pest elimination industry recognizes two market segments: commercial and residential.[18] (PSOF ¶ 7.) Indisputably, Ecolab generates the vast majority of its sales servicing commercial clients, rather than private residences.[19] (PSOF ¶ 8; DSOF ¶ 4.) Ecolab concedes that the pest elimination industry views it as "focused on the business sector." (PSOF ¶ 17; Beehler Dep. 77:24-78:12.)

The distinction between commercial and residential sheds no light on whether such sales are wholesale or retail. It is quite clear that sales to commercial entities are not necessarily wholesale. The Supreme Court recognized that "Congress also intended that the retail exemption extend in some measure beyond consumer goods and services to embrace certain products almost never purchased for family or noncommercial use." Idaho Sheet Metal, 383 U.S at 203. The simple fact that the services provided by Ecolab were sold to business customers and not to households does not place Ecolab outside the scope of the § 7(i) exemption. Although Ecolab markets its services to commercial entities and is in a position to offer these services at a discounted rate, they nonetheless serve the everyday needs of the community. The public requires and demands a clean,

---

[18] Plaintiffs offer a comparison chart of the top 100 pest control companies by revenue in 2005, created by industry publication, Pest Control Technology Online ("2005 PCT Chart"). (See Sweeney S.J. Decl., Ex. 4.) Among the statistical categories are percentages for revenues derived from residential ("% Res") and commercial ("% COM") clients, which, when combined, total 100% of yearly revenues. (Id.) In his March 28, 2007 Rule 30(b)(6) Deposition, Dave Beehler, the Controller for Ecolab's Pest Elimination Division, testified that Ecolab focused primarily on the commercial, rather than residential, market. (See Sweeney S.J. Dec., Ex. 5 ("Beehler Dep."), 76:5-78:12.) These sources suggest that, for purposes of both comparative industry analysis and marketing strategy, the pest control market is divided into two sectors: residential and commercial.

[19] Ecolab provides services primarily to businesses but not to the exclusion of private residences. (Defendant's Response to PSOF (Def.'s Resp.) ¶ 12.) There is some inconsistency in the parties' supporting evidence. A chart listing Ecolab's 2006 sales by market class code shows that revenue generated from "private homes" was approximately $1.9 million of an overall $268.7 million in sales. (Sweeney S.J. Decl., Ex. 7.) The 2005 PCT Chart reports that Ecolab generated 100% of its revenues in 2005 from the commercial sector. (PSOF ¶ 18.) In either case, Ecolab derives the overwhelming majority of its revenues from commercial clients. Beehler admits that less than one percent of Ecolab's total sales are to private homes. (Beehler Dep. 77:19-23.)

pest-free environment in both home and workplace, dining room and restaurant, bedroom and hotel room. The provision of extermination services to commercial entities where members of the public work, eat, or sleep is no less a community service than the provision of such services to individual households.[20]

Plaintiffs next turn to the nature of Ecolab's sales themselves. The majority of Ecolab's sales force is devoted to attracting multiple unit corporate accounts. (PSOF ¶¶ 27, 28.) In its training manual, Ecolab states that so-called "corporate account customers"—described as "multi-unit operations or select prestigious accounts"— represent about seventy-five percent of the customer contract base.[21] (Sweeney S.J. Decl. Ex. 3, at D000797.) Ecolab also markets its services to government agencies and obtains some business from the government sector by entering into a bidding process for contracts.[22] (PSOF ¶¶ 32-35.) Ecolab offers corporate clients with multiple locations special pricing and discounts. (PSOF ¶¶ 30, 31.) Ecolab's Account Executive Guide states, "Corporate account managers have certain pricing concessions available through them based on the size and volume associated with a particular chain customer." (Sweeney S.J. Decl., Ex. 1 at D001468.) Independently-owned franchises can receive

---

[20] See Schwind, 371 F. Supp. 2d at 566 (concluding that a provider of high end software and computer training exclusively tailored for commercial entities serves the everyday needs of the community).

[21] There is some discrepancy as to how much of the Ecolab clientele is serviced under a contract covering multiple units. Ecolab differentiates between contracts that cover a single location and contracts that cover multiple locations. (Def.'s Resp. ¶ 25.) It states that the latter comprises approximately eighteen percent of the customer contract base. (Def.'s Resp. ¶ 25.) The parties' seemingly adverse positions in this regard are not necessarily at odds; one would expect Ecolab to devote considerably more time developing potentially lucrative relationships with larger, multiple location corporate clients. The fact that contracts with such clients make up a comparatively small portion of the overall contract base does not mean that they are not the heartland customer target for Ecolab nor that individual locations subject to a multi-unit corporate contract constitute seventy-five percent of the establishments serviced by Ecolab. Indeed, in its Account Executive Guide, Ecolab states that "Corporate Accounts make up the bulk of Ecolab Pest Elimination's contract volume." (Sweeney S.J. Decl., Ex. 1 at D001467.)

[22] Ecolab solicits government contracts through competitive bidding processes, though revenues stemming from such contracts constitute only between 6.3% and 7.4% of revenues. (Def.'s Resp. ¶ 35.) Although these revenues are not the product of retail sales, see 29 C.F.R. § 779.328(d), they alone do not meet the 25% threshold for non-retail sales.

adjusted pricing either under a "group purchasing decision or as individuals that get corporate pricing because of their affiliation."[23] (Sweeney S.J. Decl., Ex. 1 at D001467.)

Plaintiffs rely heavily on these characteristics because services sold "in a quantity approximating the quantity involved in a normal wholesale transaction and as to which a special discount from the normal retail price is given is generally regarded as a wholesale sale in most industries." 29 C.F.R. § 779.328(b); see also Wirtz v. Steepleton General Tire Co., reported sub nom, Idaho Sheet Metal, 383 U.S. 190, 204 (1966) ("[B]oth the legislative history and common parlance suggest that 'the term retail becomes less apt as the quantity and the price discount increases in a particular transaction.'"). It is important, however, to note that both the regulation and the Steepleton decision addressing the retail versus wholesale determination dealt with the distinction as it related to the § 13(a)(2) exemption. Under § 13(a)(2), where Congress sought to insulate local interests at the end of the stream of commerce from federal oversight of employee compensation, the fact that a business was engaged in wholesale sales indicated that it was still part of that stream—it was selling goods in bulk to be resold by more local establishments. The retail/wholesale distinction does not serve the same purpose for the application of the § 7(i) exemption, which focuses on the employee's compensation rather than the employer's size or business plan. See supra Discussion Part I.A. So long as the employee meets the other elements of the § 7(i) exemption—he receives commissions and his total wages meet the statutory threshold—it makes little difference whether he performs his services as part of a bulk, discount arrangement with a thousand-unit fast food chain or a single one-off sale to a homeowner.

---

[23] For instance, on marketing fliers distributed for multiple location customers such as franchisee for MedAssets and Outback Steakhouse Inc., Ecolab notes that, by virtue of their corporate affiliation, they are entitled to price discounts. (Sweeney S.J. Decl., Ex. 9.)

Finally, both parties rely on a series of DOL opinion letters that shed light on the agency's view of the retail versus wholesale question as it applies to the pest elimination industry. Plaintiffs rely on a 1973 opinion, which states that pest elimination services performed for commercial clients under extended contracts are "maintenance" operations, and not considered "retail" sales. U.S. DOL, Wage & Hour Opinion Letter, WH-243 (Nov. 27, 1973). It also states that services performed for residential and commercial clients are both considered retail sales so long as the same exterminating equipment is used in servicing commercial and industrial buildings. Id. Ecolab counters with a 1982 opinion, which recognizes services performed for both residential and commercial customers as retail even when performed under contract. DOL Opinion Letter (July 14, 1982). In its most recent statement, a 2006 opinion regarding the plumbing industry, the agency opines that facility repair services (analogous to pest elimination services) qualify for the § 7(i) exemption whether performed for residential or commercial clients so long as such services do not require the use of specialized equipment and the services are not different than those used for the general public. See DOL Opinion Letter, FLSA-22 (June 23, 2006).

DOL apparently distinguishes retail from wholesale pest elimination services based on the character of the customer as residential or commercial. It is not surprising as these letters rely on DOL interpretive regulations that say exactly the same thing. They are unpersuasive.[24] The use of a different grade of pesticide or more powerful chemical sprayer has no impact on the classification of sales to end consumers; nor should it impact the compensation of the technicians using such materials. Detailed,

---

[24] See Christensen v. Harris County, 529 U.S. 576, 587 (U.S.) ("Interpretations such as those in opinion letters-like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law-do not warrant Chevron -style deference.").

industry-specific applications faithful to patently outdated agency interpretations are as unpersuasive as the interpretations themselves. Moreover, the agency itself does not rely on such distinctions. In a 2006 survey of employment and wages for pest control workers, DOL reports "Services to Buildings and Dwellings"—i.e., commercial and residential—as a single "industry" without distinguishing them. <u>See</u> U.S. Dep't of Labor, Bureau of Labor Statistics, Occupational Employment and Wages, May 2006, 37-2021 Pest Control Workers, http://www.bls.gov/oes/current/oes372021.htm. If DOL does not differentiate such services when analyzing wages—which is, after all, the purpose of the FLSA—neither should the Court.

Furthermore, the § 7(i) exemption was intended to apply even to those large enterprises comprised of multiple establishments. The success of these enterprises is partly explained by their ability to realize certain economies of scale. For instance, a nationwide enterprise such as Ecolab can reduce costs by grouping functions, such as sales and customer service, in a singe location or in a relatively small number of regional offices. Services provided by multi-unit enterprises are attractive to consumers, in part, because the providers can pass along these overhead savings in the form of price discounts. Ecolab can provide the lower rates it offers, in part, because of its corporate infrastructure. It makes little sense that an exemption designed to cover large enterprises would be inapplicable to a particular employer based on its realization of the scale benefits of larger corporations.

Based on the foregoing, the Court concludes that at least 75% of Ecolab's sales are recognized as retail sales in the pest elimination industry. Sales of pest elimination services have an undisputable retail concept as they serve the everyday needs of the community and are at the end of the stream of commerce.

## D. Practical Considerations

Finally, as a practical matter, the relief Plaintiffs seek "would complicate the law without furthering the purposes of the overtime provision.  The purposes are to spread work in order to reduce unemployment, to discourage (by increasing the cost to the employer) a degree of overtime that might impair workers' health or safety, and to increase the welfare of low-paid workers." Yi, 480 F.3d at 510 (citing Mechmet, 825 F.2d at 1175-76).  Plaintiffs concede that they earned one and one-half times the minimum wage and received more than half of this compensation in the form of commissions, so a certain level of financial welfare has already been established.  Service specialists are skilled employees who are not readily interchangeable with a general pool of non-specialized laborers, so forcing Ecolab to pay overtime would not induce employers to hire additional exterminators rather than reluctantly pay the overtime premium to the ones they have.  Finally, service specialists earn approximately three to seven times the minimum wage.[25]

The § 7(i) exemption was designed to address inequities that can arise in paying overtime to commissioned employees.  Service specialists, who are paid on a commission basis and are able to set their own schedules, can work fewer hours in one week and more in the next.  If they received overtime, employees could compress their hours into one week (e.g., work 60 hours) to obtain overtime pay, and then coast during the next week (e.g., work 10 hours).  By doing so, employees would end up working fewer hours than a regular employee working two forty hour work weeks, but yet earn more. See Yi, 480

---

[25] In 2005, the minimum wage was $5.15. See U.S. Employment Standards Administration, Table 630: Federal Minimum Wage Rates:  1950 to 2009, http://www.census.gov/compendia/statab/tables/08s0630.pdf.  That number multiplied by 2,080 hours (52 weeks x 40 hours per week) results in a minimum wage salary of $10,712.  Even the lowest-earning service specialists in 2005 earned three times this figure. See supra note 3.  By federal statutory standards, Ecolab service specialists are not underpaid.

F.3d at 508 (explaining that for employees exempt under § 7(i), their hours of work may be less than those of regular hourly employees, and if paid overtime, their annual income would be higher even though they had worked fewer hours, and citing this as one of the rationales for the exemption).

At present, service specialists, who work independently and without significant oversight, are given both time and financial incentives to perform their assignments quickly and efficiently. If the overtime requirement applied, however, this incentive would be lost. In the absence of direct supervision, service specialists could work as slowly as possible to generate hours in excess of forty per week. While "[t]he Act's overtime provisions apply to work performed off premises, outside of the employer's view and sometimes at odd hours, where an employer's concurrent knowledge of an employee's labor is not the norm," Chao v. Gotham Registry, Inc., 514 F.3d 280, 287 (2d Cir. 2008) (citing 29 C.F.R. § 785.12), this edict applies with significantly less force when the unsupervised employee has an incentive to work as short a workweek as possible—the fewer hours it takes a specialist to reach a commission plateau, the higher his rate of compensation.[26] This ensures that time is not wasted simply to increase hours worked. Surely, in an effort to protect and properly compensate American workers, Congress did not intend inefficiency and poor performance as a byproduct.

---

[26] Ecolab provides the following example to illustrate how a service specialist may increase his rate of compensation:

> [T]wo commissioned employees earning $1,000 in commissions per week will have different rates of pay per hour based on the number of hours it takes them to earn these commissions. The regular rate of pay for an employee taking 30 hours to earn $1,000 is $33.33. The regular rate of pay for an employee taking 50 hours is $20. Hourly employees, in contrast, cannot affect their rate of pay regardless of how efficient they are. A superstar working 40 hours per week earning $10 per hour will make the same as a slacker working the same number of hours at the same rate.

(Def.'s Mem. S.J. at 7-8.)

Plaintiffs, based out of publicly accessible home offices, worked for an establishment, their services were not sold for resale, and more than 75% of these sales were recognized as retail in the industry. Recognizing that there is no dispute as to the other elements of the § 7(i) exemption, the Court concludes that Plaintiffs worked for a retail or service establishment and are, therefore, exempted from FLSA coverage under 29 U.S.C. § 207(i).

## CONCLUSION

For the foregoing reasons, Ecolab's motion for summary judgment is granted and Plaintiffs' motion for summary judgment, insofar as it pertains to the § 7(i) exemption, is denied. In light of this holding, the Court need not address Plaintiffs' arguments pertaining to the Motor Carrier Act exemption nor their motion for conditional certification. The Clerk of Court is directed to terminate this action and enter judgment.

Dated: March 28, 2008
New York, NY

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge

Plaintiffs, based out of publicly accessible home offices, worked for an establishment, their services were not sold for resale, and more than 75% of these sales were recognized as retail in the industry. Recognizing that there is no dispute as to the other elements of the § 7(i) exemption, the Court concludes that Plaintiffs worked for a retail or service establishment and are, therefore, exempted from FLSA coverage under 29 U.S.C. § 207(i).

## CONCLUSION

For the foregoing reasons, Ecolab's motion for summary judgment is granted and Plaintiffs' motion for summary judgment, insofar as it pertains to the § 7(i) exemption, is denied. In light of this holding, the Court need not address Plaintiffs' arguments pertaining to the Motor Carrier Act exemption nor their motion for conditional certification. The Clerk of Court is directed to terminate this action and enter judgment.

Dated: March 28, 2008
     New York, NY

SO ORDERED

PAUL A. CROTTY
United States District Judge